Robert S. Green (State Bar No. 136183)
**GREEN & NOBLIN, P.C.**
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA 94939
Telephone: (415) 477-6700
Facsimile: (415) 477-6710
Email:  gnecf@classcounsel.com

James R. Noblin (SBN: 114442)
**GREEN & NOBLIN PC**
4500 East Pacific Coast Highway, 4TH Floor
Long Beach, California 90804
Telephone:  (562) 391-2487
Facsimile:   (415) 477-6710
Email:  gnecf@classcounsel.com

Attorneys for Plaintiff,
ARLAND KELLEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ARLAND KELLEY, Derivatively on Behalf of HCP, INC., | Case No.: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| HCR MANORCARE, INC.,LAURALEE E. MARTIN, THOMAS M. HERZOG, TIMOTHY M. SCHOEN, MICHAEL D. MCKEE, BRIAN G. CARTWRIGHT, CHRISTINE N. GARVEY, DAVID B. HENRY, JAMES P. HOFFMANN, PETER L. RHEIN, JOSEPH P. SULLIVAN, | |
| Defendants, | |
| - and - | |
| HCP, INC., | |
| Nominal Defendant. | |

## INTRODUCTION

Plaintiff Arland Kelley ("Plaintiff"), by and through his attorneys, brings this shareholder derivative action on behalf of Nominal Defendant HCP, Inc. ("HCP" or the "Company") against the current and former members of its Board of Directors ("Board") and/or certain of its executive officers. This action seeks to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and other violations of the law. Plaintiff alleges upon personal knowledge as to himself and as to all other matters based upon the investigation conducted by his attorneys, which include, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, related litigation against the Company and other publicly available information regarding the Company.

## NATURE OF THE ACTION

1.      HCP is a real estate investment trust. HCP invests in health care related real estate properties such as senior housing, life sciences, medical offices, hospitals, and skilled nursing homes throughout the United States. The Company's portfolio is comprised of investment in the following healthcare segments: (i) senior housing, (ii) post-acute/skilled nursing, (iii) life science, (iv) medical office, and (v) hospital.

2.      According to its SEC filings, HCR ManorCare, Inc. ("ManorCare") is the Company's largest tenant, representing 23% of the Company's gross assets and revenues for the year ended December 31, 2015. Furthermore, as of December 31, 2015, the Company had interests in 311 post-acute/skilled nursing facilities ("SNFs"). SNFs offer restorative, rehabilitative, and custodial nursing care for people following a hospital stay or not requiring the more extensive and complex treatment available at hospitals.

3.      On April 8, 2011, the Company announced that it closed the acquisition of 334 post-acute, skilled nursing and assisted living facilities of ManorCare for a total consideration of $6.1 billion in cash. In connection with the closing, HCP entered into a long-term triple-net master lease under which ManorCare would continue to operate the facilities. Additionally,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   HCP exercised its option to purchase an equity interest in the operations of ManorCare for $95

2   million, which represented a 9.9% equity interest at closing.

3        4.      Prior to its acquisition of ManorCare, HCP and its management knew of

4   wrongful and fraudulent practices that occurred at ManorCare facilities. Specifically, three

5   whistleblower lawsuits were filed in the U.S. District for the Eastern District of Virginia in 2009

6   and 2011 against ManorCare and its affiliates, as a result of ManorCare's illegal billing

7   practices (the "Whistleblower Lawsuits"). The Company did not disclose this information to

8   shareholders until approximately six years later. Furthermore, as a result of ManorCare's

9   fraudulent billing practices, the Department of Justice ("DOJ") commenced an investigation into

10  the billing practices at ManorCare. Despite these facts, the Board has taken no action. The

11  Company is currently facing massive exposure due to the illegal insurance billing scheme by

12  ManorCare that occurred from 2006 to at least 2012.

13       5.      On April 20, 2015, the DOJ unsealed its Consolidated Complaint in Intervention

14  (the "DOJ Complaint")[1], a previously filed complaint in intervention in the Whistleblower

15  Lawsuits filed against ManorCare and certain of its affiliates. Defendants continued to deny the

16  severity of the DOJ's allegations against ManorCare and continued to deny any wrongdoing by

17  ManorCare.

18       6.      In its detailed complaint, the DOJ alleged that ManorCare engaged in a

19  nationwide scheme from 2006 to at least 2012 to bill Medicare and TRICARE for services that

20  were not reasonable and necessary and/or were not skilled in nature. The DOJ further alleged

21  that this scheme originated at ManorCare's corporate level, where executives set prospective

22  billing targets at the highest level of reimbursement (known as the "Ultra High" level) and

23  required that all new patients receive enough minutes of therapy during their first assessment

24  period to qualify for Ultra High billing.

25       7.      The illegal insurance fraud scheme was implemented through pressure that

26  extended from the corporate level to the SNF administrators, who were threatened with adverse

27
28  [1] *United States of America, ex rel. Ribik, Carson, and Slough v. HCR ManorCare, Inc., ManorCare Inc., HCR ManorCare Services, LLC and Heartland Employment Services, LLC,* Civil Action Numbers: 1:09cv13; 1:11cv1054; 1:14cv 1228.

consequences, including termination, if their facilities did not meet the corporate billing goals. ManorCare's SNF administrators, in turn, pressured individual therapists to provide patients with treatment that was neither reasonable nor necessary for the sole purpose of allowing ManorCare to bill as many patients as possible at the Ultra High level. As a consequence of this pressure, ManorCare's Ultra High billings increased dramatically from 2006 to 2012.

8.     Despite the massive exposure the Company faces as a result of ManorCare's illegal scheme, Defendants continued to provide a positive and robust picture of ManorCare's financial condition and business prospects.

9.     The truth was completely disclosed on February 9, 2016, when Defendants caused the Company to disclose that its equity in ManorCare had been written down to zero and that it had taken an $836 million non-case impairment on its ManorCare lease assets. The Company also disclosed that it had changed the way lease revenue from ManorCare was accounted to a "cash only" basis since the Company could no longer rely on ManorCare to pay rent. The Company also revealed high legal costs incurred by ManorCare in defending the whistleblower and DOJ lawsuits.

10.     It is clear that Defendants breached their fiduciary duties owed to HCP by causing the Company to make false and misleading statements including but not limited to the following: i) that ManorCare was actively violating state and federal laws by engaging in insurance fraud; ii) that ManorCare's consolidated financial statements were issued in violation of GAAP; and iii) that ManorCare's reported revenue and business prospects were false.

11.     As a result of the Board's actions, the Company has already suffered, and will continue to suffer, substantial financial damage. A related securities fraud class action was brought against HCP and remains pending in the Southern District of Ohio (the "Securities Action").

12.     Plaintiff brings this derivative action to: a) recover damages against the Individual Defendants for the benefit of the Company; and b) require the Company to reform and improve its corporate governance and internal procedures to protect HCP and its shareholders from a repetition of the damaging events alleged herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction over this action under 28 U.S.C. §1332(a)(2), as plaintiffs and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more Defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred within this district, and (3) Defendants have received substantial compensation in this district by conducting business herein and by engaging in numerous activities that have had an effect in this district.

16.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

**PARTIES**

17.     Plaintiff Arland Kelley ("Plaintiff"), is a current shareholder of the Company and has been a continuous shareholder of the Company. Plaintiff is a citizen and resident of the state of New York.

18.     Nominal Defendant HCP, Inc. ("HCP") is incorporated in the State of Maryland and maintains its principal place of business at 1920 Main Street, Suite 1200, Irvine, California 92614.

19.     Defendant ManorCare is incorporated in the State of Delaware with its principal offices at 333 N. Summit St., Toledo, OH 43604. ManorCare is a provider of short-term, post-hospital rehabilitation, complex medical services, and long-term care.

20.     Defendant Lauralee E. Martin ("Martin") was an HCP director from 2008 until July 11, 2016 and the Company's Chief Executive Officer from October 2013 until her employment terminated on July 11, 2016. Upon information and belief, Martin is a citizen and resident of the state of Washington.

21.     Defendant Thomas M. Herzog ("Herzog") was appointed the Company's President since June 2017 and has served as CEO and a member of the Board since January 2017. From June 2016 to December 2016, Herzog served as the Company's Vice President and CFO, a role he formerly held from April 2009 to May 2011. Upon information and belief, Herzog is a citizen and resident of the state of California.

22.     Defendant Timothy M. Schoen ("Schoen") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") from 2011 until his resignation effective May 22, 2016.  Upon information and belief, Schoen is a citizen and resident of the state of California.

23.     Defendant Michael D. McKee ("McKee") has served as a director of the Company since 1989. From July 2016 to December 2016, McKee served as interim President and CEO. McKee serves as Chairman of the Nominating and Corporate Governance and Compensation Committees. Upon information and belief, McKee is a citizen and resident of the state of California.

24.     Defendant Brian G. Cartwright ("Cartwright") has served as a director of the Company since 2013. Cartwright serves as Chairman of the Audit Committee. Upon information and belief, Cartwright is a citizen and resident of the state of California.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

25.     Defendant Christine N. Garvey ("Garvey") has served as a director since 2007. Garvey is a member of the Audit and Compensation Committees. Garvey served as Chairman of the Audit Committee until July 30, 2015. Upon information and belief, Garvey is a citizen and resident of the state of California.

26.     Defendant David B. Henry ("Henry") has served as a director of the Company since 2004. Henry is Chairman of the Compensation Committee and is a member of the Nominating and Corporate Governance Committee. Upon information and belief, Henry is a citizen and resident of the state of California.

27.     Defendant James P. Hoffmann ("Hoffmann") has served as a director since 2014. Hoffmann is a member of the Audit and Nominating and Corporate Governance Committees. Upon information and belief, Hoffmann is a citizen and resident of the state of California.

28.     Defendant Peter L. Rhein ("Rhein") has been a director of the Company since 1985. From 1985 to 2008, Rhein served as Chairman of the Audit Committee. He currently serves as a member of the Audit Committee. Upon information and belief, Rhein is a citizen and resident of the state of California.

29.     Defendant Joseph P. Sullivan ("Sullivan") has served as a director since 2004. Sullivan serves as a member of the Compensation Committee. Upon information and belief, Sullivan is a citizen and resident of the state of California.

30.     Defendants Martin, Herzog, Schoen, McKee, Cartwright, Garvey, Henry, Hoffmann, Rhein, and Sullivan are collectively referred to herein as the "Defendants" or the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

31.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

32.    Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their executive, managerial, and/or directorial positions within the Company, as well as their backgrounds and educations, each of the Individual Defendants had access to adverse, non-public information about the Company's financial condition and operations, and the misrepresentations made relevant thereto.

34.    At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

35.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

    a.    manage, conduct, supervise, and direct the business affairs of the Company in accordance with all applicable laws;

    b.    neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

    c.    establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of

the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

e.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

f.    properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

g.    remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

36.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

37.    The Individual Defendants breached their duties of loyalty and good faith by permitting defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or

officers of the Company from taking such illegal actions. In addition, the Company is now the subject of class action litigation alleging violation of federal securities laws, which necessitates the Company to incur excess costs arising from the Individual Defendants' wrongful course of conduct.

## SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company and ManorCare

38.    According to its SEC filings, HCP is a corporation that qualifies as a real estate investment trust ("REIT"), which invests primarily in real estate serving the healthcare industry in the United States. The Company acquires, develops, leases, manages, and disposes of healthcare real estate and provides financing to healthcare providers.

39.    ManorCare was formerly known as Health Care and Retirement Corporation and changed its name to HCR ManorCare, Inc. in November 1998. ManorCare provides short-term, post-hospital, and long-term care services for individuals who are discharged from the hospital and require additional nursing and rehabilitation care in the United States.

40.    In December 2007 ManorCare and its respective nursing homes were acquired by the Carlyle Group through a merger that was approved by ManorCare's shareholders on October 17, 2007.

### B.    HCP's Acquisition of ManorCare

41.    On December 13, 2010, HCP announced that it signed a definitive agreement to acquire substantially all of the real estate assets of ManorCare for a purchase of $6.1 billion. As part of the acquisition, HCP acquired from ManorCare 338 post-acute, skilled nursing and assisted living facilities.

42.    ManorCare and its affiliates would continue to operate the assets pursuant to a long-term triple-net master lease supported by a guaranty from ManorCare. Furthermore, ManorCare would grant HCP an option to acquire a 9.9% interest in ManorCare for an additional purchase price of $95 million.

43.    The day after the acquisition was announced, on December 14, 2010, the Company hosted a conference call. During the call, the Company's then-CEO, James Flaherty

("Flaherty"), on behalf of the Company, assured the investing public that HCP conducted substantive due diligence prior to the Company's acquisition of ManorCare. Specifically, Flaherty stated the following in relevant part:

> We have been in on-again/off-again and on-again/off-again discussions for well over a year at this point. … At this point, we know each other very well. We are very well versed in terms of the company's [ManorCare's] business strategy, business model, our respective teams. I am not sure there has been more than a couple weeks where there haven't been some significant interactions. … [I]t has been a 15-month plus dialogue.

44.    On April 7, 2011, the acquisition of ManorCare closed and the Company acquired substantially all of the real estate assets of ManorCare for $6.1 billion and acquired a 9.9% equity interest in ManorCare for $95 million.

### C.    ManorCare Engaged in an Ongoing Illegal Billing and Insurance Scheme Prior to the Company's Acquisition

45.    On April 10, 2015, the DOJ disclosed its Consolidated Complaint in Intervention (the "DOJ Complaint") against ManorCare for submitting false or fraudulent claims for payment to Medicare and TRICARE for rehabilitation therapy services. The DOJ Complaint alleges that ManorCare billed federal healthcare programs for services that were not reasonable and necessary, and/or were not skilled in nature and thus did not meet the coverage requirements governing benefits related to SNF care and that ManorCare knew or should have known that these services were not eligible for reimbursement under the SNF benefit. The DOJ Complaint alleges that from at last October 1, 2006 through May 31, 2012, ManorCare engaged in a nationwide scheme to bill healthcare programs without regard to its patients' actual conditions or needs.

46.    The DOJ Complaint also details the fact that ManorCare received numerous complaints, from inside and outside the company, that corporate pressure to meet the highest daily rate target that Medicare will pay a SNF for rehabilitation therapy was undermining therapists' clinical judgment at the expense of its patients' wellbeing. ManorCare made no changes in response to these complaints.

47.    On September 28, 2015, *Bloomberg News* reported the following: "on September 4, 2015, the Honorable Claude M. Hilton denied Defendants' Motion to Dismiss finding that the government's complaint alleging Medicare fraud stated a viable cause of action under the False Claims Act." *Bloomberg News* stated the following:

> In April 2015, the United States disclosed its filing of a consolidated complaint against HRC ManorCare for submitting false claims to Medicare for rehabilitation services. Defendants HCR ManorCare, Inc., Manor Care, Inc., HCR ManorCare Services LLC, and Heartland Employment Services LLC filed a Motion to Dismiss on July 7, 2015 in the U.S. District for the Eastern District of Virginia. On September 4, 2015, Judge Claude M. Hilton denied Defendants' Motion to Dismiss finding that the government's complaint alleging Medicare fraud in the provision of skilled therapy services stated a viable cause of action under the False Claims Act. In their Motion to Dismiss Defendants argued that the government had failed to state a claim as matter of law because the disputed reimbursement claims involve clinical disagreements over what constitutes reasonable and necessary therapy. Judge Hilton, ruling from the bench, rejected this argument noting that if such position was adopted, there could never be a False Claims [A]ct case. Under Medicare, nursing homes bill skilled therapy at one of five different levels - Low, Medium, High, Very High or Ultra High - based on the amount of therapy that the patient needs. At the time of oral argument, ManorCare's attorney failed to address the significant increase in Ultra High billing levels for ManorCare facilities. With the Motion to Dismiss denied, the case will now transition into discovery, where the government will seek to develop additional information supporting their fraud allegations.

**D.    False and Misleading Statements**

48.    On February 10, 2015, the Company filed its annual report for the fiscal year ended December 31, 2014 with the SEC (the "2014 10-K") which was signed by Defendants Martin, Schoen, Cartwright, Garvey, Henry, Hoffmann, McKee, Rhein, and Sullivan. The 2014 10-K highlighted the financial importance of ManorCare to HCP by disclosing that revenues obtained from ManorCare's tenancy represented 85% of HCP's revenues for the post-acute/skilled nursing segment.

49.    The 2014 10-K reported that the Company collected over $1.7 billion between February of 2014 and January 21, 2015 in exchange for senior unsecured notes. As of December 31, 2014, the Company had senior unsecured notes outstanding with an aggregate principal balance of $7.6 billion. Despite carrying this vast amount of debt, on January 29, 2015, the Company announced that its Board declared a quarterly cash dividend of $0.565 per share.

Additionally, during fiscal 2014, the Company repurchased 323,000 shares of its own common stock. Since the Company reported total revenues of over $2.26 billion for fiscal 2014 and revenues from ManorCare represented 26% of those revenues, ManorCare paid HCP approximately $590 million in fiscal 2014.

50.    On April 21, 2015, the Company filed a Form 8-K with the SEC, signed by Defendant Schoen, which, for the first time, publicly disclosed details of the DOJ investigation of ManorCare, which had been ongoing for approximately three years. The Company made its announcement regarding the unsealing of a DOJ complaint against ManorCare that was filed in the United States District Court for the Eastern District of Virginia. The press release stated in relevant part:

> The United States Department of Justice ("DOJ") filed a complaint that was released from seal on April 20, 2015, against HCR ManorCare, Inc. and certain of its affiliates (collectively "HCRMC"). The DOJ's complaint follows a civil investigation of three previously-sealed lawsuits filed by former employees of HCRMC under the qui tam provisions of the federal False Claims Act. The United States intervened against HCRMC in the parts of the civil actions alleging that they submitted claims to Medicare for therapy services that were not covered by the skilled nursing facility benefit, were not medically reasonable and necessary, were not skilled in nature, and therefore not entitled to Medicare reimbursement. The cases are consolidated in the United States District Court for the Eastern District of Virginia. The DOJ complaint relates to the previously disclosed Civil Investigative Demand and related requests for information regarding HCRMC's skilled nursing facilities coordinated by the DOJ.

51.    The Company downplayed the significance of the ongoing DOJ investigation, stating that ManorCare "intends to vigorously defend the DOJ's civil action" and that "[t]he government's case against [ManorCare] is one of several brought in the past few years against skilled nursing facility operators alleging the provision of unnecessary rehabilitation therapy."

52.    On May 5, 2015, the Company filed a quarterly report for the three-month period ending March 31, 2015 on a Form 10-Q with the SEC ("1Q 2015 10-Q"), which was signed by Defendants Martin and Schoen. The 1Q 2015 10-Q disclosed more details regarding the DOJ investigation of ManorCare and its intervention in the whistleblower actions. The following was disclosed in relevant part:

On April 20, 2015, the U.S. Department of Justice ("DOJ") unsealed a previously
filed complaint in the United States District Court for the Eastern District of
Virginia against HCRMC and certain of its affiliates in three consolidated cases
following a civil investigation arising out of three lawsuits filed by former
employees of HCRMC under the qui tam provisions of the federal False Claims
Act. The DOJ's complaint in intervention is captioned *United States of America,
ex rel. Ribik, Carson, and Slough v. HCR ManorCare, Inc., ManorCare Inc.,
HCR ManorCare Services, LLC and Heartland Employment Services, LLC* (Civil
Action Numbers: 1:09cv13; 1:11cv1054; 1:14cv1228 (CMH/TCB)). The
complaint alleges that HCRMC submitted claims to Medicare for therapy
services that were not covered by the skilled nursing facility benefit, were not
medically reasonable and necessary, and were not skilled in nature, and therefore
not entitled to Medicare reimbursement.

53.     The Company did acknowledge that "a significant adverse judgment against
[ManorCare] or significant settlement obligation could impact the carrying value of the
Company's investments in [ManorCare]'s operations and/or DFLs investment further." Thus,
investors were led to believe that HCP was adjusting its financial figures to account for
ManorCare's almost certain impending liability. The Company also represented that it recorded
a non-cash impairment charge of $478 million related to its DFL investments with ManorCare,
which reduced the carrying value of the ManorCare DFL investments from $6.6 billion to $6.1
billion. The 1Q 2015 10-Q reported a carrying value of the Company's investment in
ManorCare of over $51.6 million and a 9.4% ownership interest in ManorCare. According to the
1Q 2015 10-Q, the Company's interests in ManorCare represented 29% of the Company's total
assets as of March 31, 2015. Lastly, the 1Q 2015 10-Q disclosed that: (1) the value of the
Company's post-acute/skilled nursing segment, based on total assets, was $6,488,822,000 and
(2) as of March 31, 2015, ManorCare assets accounted for 79% of HCP's gross assets in the
post-acute/skilled nursing segment. Thus, the Company represented to its investors that the
value of ManorCare assets was $5,126,169,380. Notably, the Company represented that "[t]he
accompanying unaudited consolidated financial statements have been prepared in accordance
with U.S. generally accepted accounting principles ('GAAP') for interim financial information."

54.     On May 5, 2015, after the release of the 1Q 2015 10-Q, the Company held a
conference call with investors to discuss the financial results from the first quarter and pending
questions about the Company's news regarding ManorCare. The Company represented that it

had "completed a very positive first quarter" and that ManorCare's "results were also ahead of their 2015 budget." Defendant Martin, on behalf of the Company, stated that "we do not anticipate a significant impact to HCR's profitability in the near future," and that the Company was not aware of "any potential revenue lost that the Company might have going forward." Defendant Martin also stated the following:

> [T]he investigation by the Department of Justice has been ongoing for about three years. HCR has maintained their business practices throughout that time and, in fact, has continued to increase market share and provider relationships who are focused on the outcomes that they achieve in terms of think [sic] about hospital readmissions and so forth. I would also add that -- and we mentioned this on a prior call -- that in conjunction with winning some of those relationships, HCR actually had their billing practices -- and this was, again, several years ago -- audited by a CMS recommended audit firm, passed it, and felt that their practices are definitely to the standard that one would want.

55.    On August 4, 2015, the Company filed a quarterly report for the three-month period ended June 30, 2015 on a Form 10-Q with the SEC ("2Q 2015 10-Q"), which was signed by Defendants Martin and Schoen. The 2Q 2015 10-Q reported a carrying value of the Company's investment in ManorCare of almost $51 million and a 9% ownership interest in ManorCare. Additionally, the 2Q 2015 10-Q disclosed that: (1) the value of the Company's post-acute/skilled nursing segment, based on total assets, was $6,511,511,000; and (2) as of June 30, 2015, ManorCare assets accounted for 79% of HCP's gross assets in the post-acute/skilled nursing segment. Thus, the Company represented that the value of ManorCare assets was $5,144,093,690. The Company further represented that "[t]he accompanying unaudited consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ('GAAP') for interim financial information."

56.    On November 3, 2015, the Company filed a quarterly report for the three-month period ended September 30, 2015 on a Form 10-Q with the SEC ("3Q 2015 10-Q"), which was signed by Defendants Martin and Schoen. The 3Q 2015 10-Q reported a carrying value of the Company's investment in ManorCare of over $21.2 million and a 9% ownership interest. Additionally, the 3Q 2015 10-Q reported that: 1) the value of the Company's post-acute/skilled nursing segment, based on total assets, was $6,368,064,000; and 2) as of September 30, 2015,

ManorCare assets accounted for 82% of HCP's gross assets in the post-acute/skilled nursing segment. Specifically, the Company represented that "[t]he accompanying unaudited consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ('GAAP') for interim financial information." The 3Q 2015 10-Q disclosed that on October 28, 2015, the Company concluded that its 9% equity investment in ManorCare was other-than-temporarily impaired as of September 30, 2015. Accordingly, it recorded an impairment charge of $27 million during the three months ended September 30, 2015, which "reduced the carrying amount of the Company's investment in HCRMC from $48 million to its fair value of $21 million."

57.    The Company failed to admit that the impairment charge was related to ManorCare's illegal insurance fraud scheme. Instead, the Company claimed that the impairment "primarily resulted from the Company's review of recent HCRMC operating results and market and industry data." The Company further represented that ManorCare would still meet its obligations to HCP. Notwithstanding these developments, ManorCare's financial information indicated that it would continue to meet its contractual obligations to HCP under the Master Lease.

58.    On February 9, 2016, the Company filed its annual report for the fiscal year ended December 31, 2015 with the SEC (the "2015 10-K"), signed by Defendants Martin, Schoen, Cartwright, Garvey, Henry, Hoffmann, McKee, Rhein, and Sullivan. The 2015 10-K announced shocking news regarding ManorCare and the Company's investment in it, including the following: "As of December 31, 2015, the Company concluded that its equity investment in HCRMC was other-than-temporarily impaired and recorded an impairment charge of $19 million, reducing its carrying value to zero." Essentially, the Company's equity in ManorCare was worthless. In the fourth quarter of 2015, the Company recorded an allowance (impairment charge) for DFL losses of $817 million, reducing the carrying amount of its HCRMC DFL investments from $6.0 billion to $5.2 billion. The Company placed the real estate portfolio leased to ManorCare on "Watch List" status effective at year-end 2015, and changed its accounting treatment to recognize rental income on a cash basis beginning January 1, 2016.

1    Thus, the Company decided to "no longer recognize non-cash accretion income under the

2    HCRMC DFLs." According to the Company, "Finance Receivables are placed on nonaccrual

3    status when management determines that the collectability of contractual amounts is not

4    reasonably assured (the asset will have an internal rating of either Watch List or Workout)."

5    ManorCare incurred legal and regulatory defense costs of $3 million during the fourth quarter

6    2015, and $9 million for the full year 2015 in connection with the DOJ civil action.

7          59.    The Company still refused to acknowledge ManorCare's ongoing illegal

8    insurance scheme and instead represented to investors that ManorCare faced difficulties due to

9    "the ongoing change in reimbursement models which reduces rates and lowers census, the result

10   of shorter lengths of stay." Indeed, the Company specifically stated that ManorCare was below

11   its forecast for the fourth quarter, "primarily due to the continued change in payor mix from

12   traditional Medicare to Managed Care plans, which reduced reimbursement rates and lowered

13   census."

14         60.    The day the 2015 10-K was filed, the price of HCP stock plummeted $5.66 or

15   nearly 17%, going from a close of $33.99 on February 8, 2016 to a close of $28.33 on February

16   9, 2016. Over the next two trading days, the Company's stock price continued to fall, closing at

17   $27.21 on February 10, 2016 and at $26.13 on February 11, 2016. Thus, by February 11, 2016,

18   the price of HCP common stock had fallen $7.86, or over 23% from its February 8th closing

19   price.

20         61.    On March 17, 2016, the Company filed its proxy statement on Form DEF 14A

21   with the SEC (the "2016 Proxy"). The 2016 Proxy described director responsibilities, the duties

22   of each committee, Board risk management, and provided information about the director

23   nominees up for election. However, in the 2016 Proxy, the Individual Defendants

24   misrepresented and/or failed to disclose material information that resulted from ManorCare's

25   illegal billing scheme and the resulting DOJ and Whistleblower Lawsuits. The omission of this

26   material information rendered the 2016 Proxy false and misleading.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**E.    Defendant Martin and Scott Anderson were Awarded Generous Severance Packages Despite Their Disastrous Tenures with the Company**

62.    On July 11, 2016, the Company filed a Form 8-K disclosing that Defendant Martin would be resigning from her position as CEO of the Company. That same day, Defendant Martin and the Company entered into a Separation and General Release Agreement (the "Separation Agreement") pursuant to which Martin's employment terminated effective July 11, 2016. The timing of Defendant Martin's abrupt resignation is suspect since it occurred such a short time after the truth regarding ManorCare's illegal billing scheme came to light.

63.    Pursuant to the Separation Agreement, Martin will receive the following consideration:

   a.    salary continuation in an aggregate amount equal to $6,000,000, less all applicable state and federal tax withholdings and other lawful deductions, payable in equal installments in accordance with the Company's normal payroll practice over a twenty-four (24) month period, provided that the payments that would otherwise be paid during the first six months following the Separation Date shall instead be paid on January 12, 2017, and the remaining payments shall be paid over the remaining eighteen (18) month period;

   b.    reimbursement of any COBRA premiums incurred for up to twenty-four (24) months following the Separation Date;

   c.    a lump sum payment of $10,000, less all applicable state and federal tax withholdings and other lawful deductions, representing transition-related expenses and payable within ten (10) days following the Separation Date; and

   d.    continued directors' and officers' insurance coverage for six years following the Separation Date under the Company's existing or successor policy.

64.    Furthermore, all of Martin's outstanding restricted stock units ("RSUs") that are subject to time-based vesting conditions and the RSUs she was granted in respect of her service as a director will vest upon the Separation Date. Her performance-based RSUs granted in 2014 and 2015 (and their accrued dividend equivalents) will vest based on target performance upon the Separation Date, and performance-based RSUs granted in 2016 (and their accrued dividend equivalents) will remain outstanding and will vest (if at all) based on achievement of applicable

performance goals for the performance period ending December 31, 2018. Martin's restricted stock awards will vest in connection with her separation, but will remain subject to transfer restrictions until December 31, 2018. Martin's outstanding options will remain exercisable for the remainder of their term.

65.    On July 11, 2017, the Company filed a Form 8-K announcing that Scott Anderson ("Anderson"), the Company's Executive Vice President and Chief Accounting Officer[2] "will depart HCP" effective August 17, 2017.  The Company's SEC filings state that Anderson was responsible for, among other things, executing the transparency and clarity of the Company's financial disclosures, which are now known to be false and misleading.

66.    In connection with his departure, Anderson will receive, among other things, severance benefits which includes approximately $1.6 million in cash to be paid over 24 months and a partial year bonus payment of approximately $230,000 that will be paid upon his departure.  Additionally, Anderson's RSU s awarded before May 6, 2016 will vest immediately upon his departure and RSUs awarded after May 6, 2016 will continue to vest according to their original vesting schedule for two years, and thereafter the remaining RSUs will be accelerated. Lastly, Anderson's vested stock option will remain exercisable for 12 months following his departure.

67.    The decision to award Martin and Anderson generous severance packages despite their disastrous tenures with the Company is not a protected business judgment and is not aligned with the Company's shareholders' interests.

### DAMAGES TO HCP

68.    As a direct and proximate result of the Individual Defendants' actions, HCP has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to, the following:

---

[2] Anderson was promoted to Executive Vice President and Chief Accounting Officer effective January 13, 2016 and also served as the Company's interim Principal Financial Officer from May 22, 2016 through June 26, 2016.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

a.    incur substantial additional time and costs to respond to and defend ManorCare's actions in the litigation with the DOJ and any other third-party payors;

b.    refund or adjust amounts previously paid for services under governmental programs and to change business operations going forward in a manner that negatively impacts future revenue;

c.    pay substantial fines and penalties and incur other administrative sanctions, including having to conduct future business operations pursuant to a corporate integrity agreement;

d.    lose the right to participate in the Medicare or Medicaid programs;

e.    suffer damage to the Company's reputation;

f.    costs incurred as a result of the DOJ litigation which will likely have a material adverse effect on the Company and ManorCare;

g.    continued deterioration in ManorCare's operating performance, business or financial condition; and

h.    costs incurred from compensation and benefits paid to the Individual Defendants and Company executives who have breached their duties to the Company.

69.    Moreover, the actions taken by the Individual Defendants have irreparably damaged HCP's corporate image and goodwill.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

70.    Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty by the Individual Defendants. The Company is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

71.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

72.    Plaintiff is the owner of the Company's common stock and was the owner of the Company's common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

73.    At the time that Plaintiff commenced this action, the Company's Board consisted of the following directors: Defendants McKee, Herzog, Cartwright, Garvey, Henry, Hoffmann, Rhein, and Sullivan.

74.    Because of the facts set forth herein, Plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.    The principal profession of Defendant Herzog is his employment with HCP as its CEO and President, pursuant to which he receives substantial monetary compensation and other benefits. In addition, as a director of the Company he derives his principal income from his employment at the Company. Accordingly, reasonable doubt exist that Defendant Herzog can be disinterested and independent in evaluating Plaintiff's demand;

b.     Defendants Henry and Sullivan served on the Compensation Committee during all of the fiscal year ended December 31, 2015. Defendant Rhein served as member of the Compensation Committee through July 30, 2015, and Garvey and McKee were appointed as members of the Compensation Committee on July 30, 2015. Consequently, these Defendants breached their fiduciary duties of due care, loyalty, and good faith when they caused or permitted the Company to make compensation decisions that were entirely based on fictitious results fueled by Defendants' misleading statements regarding ManorCare's illegal insurance billing scheme. Further, these Defendants have done nothing to recoup this improper compensation on the Company's behalf. Furthermore, despite Martin's and Anderson's disastrous tenures with the Company, the Compensation Committee allowed Martin and Anderson to receive undeserved severance payments, essentially bestowing a gift on them, which is a waste of corporate assets. This Board decision is not a protected business judgment. Therefore, these defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

c.    Each Individual Defendant had a duty to diligently evaluate information provided to the Board by management and to ensure that reasonable systems of reporting existed such that all relevant information. It was the duty of the Individual Defendants to properly evaluate this information and provide thorough guidance and governance to the Company. The Individual Defendants failed in these duties. The Individual Defendants either evaluated this information and rubber-stamped HCP's

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

misrepresentations or failed to ensure information necessary to prevent the misrepresentations was provided to them;

d.    Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

e.    The entire Board and senior management participated in the wrongs complained of herein. For the reasons described herein, the Company's directors are not disinterested or independent. Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs. Each of the above referenced Defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements. Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violations of applicable securities laws;

f.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein, thereby rendering demand futile;

g.    The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties;

h.    In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

i.    The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification;

j.    Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein and thus could not fairly and fully prosecute such a suit even if they instituted it;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

k.     Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

l.     The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby; and

m.     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

75.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by Plaintiff herein.

76.     Furthermore, the conduct alleged herein could not have been the product of good faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional and illegal misconduct, they have subjected the Company to substantial damages. Such actions by the Individual Defendants cannot be protected by the business judgment rule. Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with, and conspired with, one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual

Defendants and ManorCare further aided and abetted and/or assisted each other in breach of their respective duties.

78.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did:

a.    Conceal the fact that the Company was improperly misrepresenting its financial results in order to allow Defendants to inflate the price of the Company's shares artificially;

b.    Maintain the Individual Defendants' executive and directorial positions at the Company and the profits, power, and prestige that the Individual Defendants enjoyed as a result of these positions; and

c.    Deceive the investing public, including shareholders of the Company, regarding the Individual Defendants' management of the Company's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financial condition that had been misrepresented by the Individual Defendants throughout the wrongdoing alleged herein.

79.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and ManorCare collectively and individually took the actions set forth herein.

80.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct during the wrongdoing alleged herein. During this time, the Individual Defendants caused the Company to conceal material facts, misrepresent its financial results, and violate applicable laws. In addition, ManorCare made specific, false statements about the its financial performance and future business prospects, as alleged herein.

81.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things: (1) to disguise the Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment; (2) to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and (3) to artificially inflate the price of the Company's stock so that the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

82.    Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct alleged herein.

83.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs alleged herein. In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.

**COUNT I**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION)**

84.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

85.    The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to HCP shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

86.    As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein. Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing. The alleged acts of wrongdoing have subjected the Company to unreasonable risks of losses and expenses.

87.    Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company. As a result of the Individual Defendants' breaches, the

Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

88.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

89.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company. The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

90.    During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct. Nevertheless, the Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company. As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

## COUNT III
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

91.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

92.    The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

93.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

### COUNT IV
### (AGAINST INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS)

94.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

95.    The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

96.    As a direct and proximate result of the Individual Defendants' waste of corporate assets, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

### COUNT V
### VIOLATION OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934
### (AGAINST ALL INDIVIDUAL DEFENDANTS)

97.    Plaintiff incorporates by reference and re-alleges all preceding and subsequent allegations, as though fully set forth herein.

98.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the 2016 Proxy violated §14(a) and Rule 14a-9 because it omitted material facts regarding the Company's operations and future prospects.

99.    The 2016 Proxy was false and misleading because among other things, the Individual Defendants failed to disclose ManorCare's illegal insurance fraud scheme. This was a component of the Company's core operations, and the omission of this material information rendered the 2016 Proxy false and misleading.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

100.    In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2016 Proxy were materially false and misleading, and/or that the 2016 Proxy omitted material information. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 Proxy.

## COUNT VI

### (AGAINST MANORCARE FOR AIDING AND ABETTING)

101.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

102.    Defendant ManorCare aided and abetted the wrongful and illegal acts alleged herein because ManorCare engaged in an insurance and billing scheme that rendered its financial information false and misleading.

103.    As a result of the wrongdoing alleged herein, ManorCare is liable for the damages it caused through its illegal conduct.

104.    Plaintiff has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C.    Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: July 21, 2017                    **GREEN & NOBLIN, P.C.**


By:   /s/ Robert S. Green
          Robert S. Green

2200 Larkspur Landing Circuit, Suite 101
Larkspur, CA  94939
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com
-and-
James R. Noblin
**GREEN & NOBLIN, P.C.**
4500 East Pacific Coast Highway
Fourth Floor
Long Beach, California 90804
Telephone:  (562) 391-2487
Facsimile:  (415) 477-6710
Email:  gnecf@classcounsel.com

*Local Counsel for Plaintiff*

William B. Federman
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
Email: wbf@federmanlaw.com
-and-
2926 Maple Avenue, Suite 200
Dallas, TX 75201

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Arland Kelley, declare that I have reviewed the Complaint ("Complaint") and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of HCP, Inc. common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

26 Jun 17
Date

(Signature of Investor)